**Greta HUSSERL, Plaintiff,**

v.

**SWISS AIR TRANSPORT COMPANY, LTD., also known as Swissair, Defendant.**

**No. 71 Civ. 3515.**

United States District Court, S. D. New York.

Nov. 3, 1972.

**703**

Gewurz & Gewurz, by Eric Gewurz, New York City, for plaintiff.

Condon & Forsyth, by George N. Tompkins, Jr., Thomas J. Whalen, and Ronald E. Pace, New York City, for defendant.

OPINION

TYLER, District Judge.

This is an action for $75,000 for bodily injury and mental anguish allegedly suffered by plaintiff as a result of a hijacking which occurred on September 6, 1970. Suit was commenced in the Supreme Court of New York, New York County on July 21, 1971, and removed here on August 9, 1971. The complaint asserts that plaintiff, a New York resident, was a passenger on defendant's aircraft, scheduled for a direct flight from Zurich, Switzerland to New York on September 6, 1970; that the "aircraft deviated from its scheduled course and thereafter landed on a desert airstrip located some distance from Aman, Jordan", Complaint, para. 8; that plaintiff remained therein for some 24 hours, and thereafter was "forced to remain" in Aman until the 11th of September. As appears from the depositions of plaintiff and of Fritz Schreiber, defendant's pilot for the flight, the "deviation" was a product of an armed takeover of the aircraft by members of the Popular Front for the Liberation of Palestine.

Plaintiff in her complaint alleges three "causes of action" deriving from the events summarized above: first, she claims under the Warsaw Convention, as modified by the Montreal Agreement[1];

1. The Warsaw Convention is officially entitled "Convention for the Unification of Certain Rules Relating to International Transportation by Air", declaration of adherence by the United States deposited at Warsaw, Poland, July 31, 1934, proclaimed October 29, 1934. 49 Stat. 3000 et seq., T.S. No. 876 (1934) (concluded at Warsaw, Poland, October 12, 1929). Essentially, the Convention creates both a presumption of liability on the part of the carrier for injury or death arising out of international transportation (subject to certain defenses), and a concomitant limitation of liability (subject to certain exceptions) to 125,000 Poincare francs (about $8,300) per passenger. The Warsaw Convention was officially "amended" (as among signatory parties) by The Hague Protocol, a treaty proposed in 1955 at The Hague and signed by 26 countries—but never ratified by the United States. L. Kreindler, 1 Aviation Accident Law, chs. 11, 12 (1971 ed.).

On November 15, 1965, the United States deposited its formal Notice of Denunciation of the Convention to the Polish Government, to become effective May 15, 1966; in the press release announcing the denunciation, the stated reason for the action was the low limits on liability for injury and death prevailing under the Convention. Dep't of State Press Release No. 268, 50 Dep't State Bull. 923 (1965). The press release further provided:

"The United States would be prepared to withdraw the notice of denunciation deposited today if prior to its effective date of May 15, 1966, there is a reasonable prospect of an international agreement on limits of liability in international air transportation in the

secondly, she asserts that defendant breached its contract to conduct her safely to New York; thirdly, she alleges that her injuries were the result of the defendant's negligence, or that of its agents.

Defendant has moved, pursuant to Rules 12(b)(6) and 56, F.R.Civ.P., to dismiss the complaint for failure to state a claim upon which relief can be granted. The grounds for the motion, as set out in the Affidavit of George N. Tompkins, Jr., verified on 17 August 1972, and in defendant's brief in support of the motion and reply brief, are that the Warsaw Convention, as modified by the Montreal Agreement, exclusively govern the liability of the air carrier engaged in international transportation; that liability arises only upon proof of the occurrence of an "accident"; that a hijacking is not an "accident" within the intendment of the Convention; that plaintiff's alleged injuries were not the product of an "accident" as contemplated by the Convention and Agreement; and that therefore defendant is not liable to plaintiff.

For the reasons discussed below, I conclude that defendant is not "entitled to judgment as a matter of law", and that there are outstanding material issues of fact which are not resolved on the record presently before the court. Rule 56(c), F.R.Civ.P.

The threshold question to be considered is one which, so far as I can determine, is of first impression in this court —namely, whether the Warsaw Convention, as modified by the Montreal Agreement, applies in a hijacking context.

Article I of the Convention in part provides:

"(1) This convention shall apply to *all international transportation* of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.

---

area of $100,000 per passenger or on uniform rules but without any limit of liability, and if, pending the effectiveness of such international agreement, there is a provisional arrangement among the principal international airlines waiving the limits of liability up to $75,000 per passenger." *Id.* at 924. On May 14, 1966, the United States formally withdrew its notice of denunciation and announced the approval by the Civil Aeronautics Board of an interim arrangement submitted by the International Air Transport Association (IATA). Dep't of State Press Release Nos. 110, 111, 54 Dep't State Bull. 955 (1966). This interim arrangement, known as Agreement CAB 18900, provides, inter alia, that the parties thereto (including the defendant and the majority of domestic and international air carriers) agree to include in their tariffs to be filed with the CAB a "special contract" by which the carrier would waive its defenses provided by Article 20(1) of the Convention and also its limitation of liability under the Convention up to $75,000. The CAB Order Approving Agreement is to be found in 31 Fed.Reg. 7302 (1966).

Together, the Agreement (signed by each airline), the requisite tariff, filed pursuant to the Agreement on May 16, 1966, the Notice to Passengers included within the ticket informing the passenger of the change in the regime of the Warsaw Convention (and of its applicability), and the CAB order, constitute what has been called the "Montreal Agreement", since these documents were initially presented at a conference in Montreal prompted by the United States denunciation of the Convention. L. Kreindler, 1 Aviation Accident Law, *supra*, §§ 12A.01–12A.07. It should be emphasized that "[t]he Montreal system has not changed the text of either the Warsaw Convention or the Hague Protocol", but rather ". . . impose[s] upon international aviation involving the United States a quasi-legal and largely experimental system of liability that is essentially contractual in nature." *Id.*, at 12A–2.

For a more fulsome discussion of the Warsaw Convention and the Montreal Agreement, see Block v. Compagnie Nationale Air France, 386 F.2d 323 (5th Cir. 1967), cert. denied 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968); L. Kreindler, 1 Aviation Accident Law, *supra*, chs. 11–13; Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967) (Mr. Lowenfeld was chairman of the United States Delegation to the Montreal Conference in 1966).

"(2) For the purposes of this convention the expression "international transportation" shall mean *any transportation* in which, *according to the contract made by the parties,* the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. . . . " (Emphasis added.)

Thus "[o]n its face, the Warsaw Convention seems to cover all international carriage by air, without any limitation whatever." Block v. Compagnie Nationale Air France, 386 F.2d 323 (5th Cir. 1967), cert. denied 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). And, as the text indicates, "international carriage" is primarily a function of the intention of the parties, as expressed in the ticket or contract. L. Kreindler, 1 Aviation Accident Law, § 11.05[1] at 25–26 (1971 ed.).

The parties do not contest that Mrs. Husserl was a passenger on defendant's flight 100, with Zurich and New York the respective places of departure and destination, that both Switzerland and the United States are "High Contracting Parties" to the Warsaw Convention, and that defendant signed Agreement CAB 18900 and pursuant thereto filed a tariff with the CAB (the "Montreal Agreement"). The parties, however, do seek to draw sharply conflicting conclusions from the apparent fact of application of the Convention to this dispute. Plaintiff contends that the Convention and the Agreement, when read together, render defendant liable for all personal injuries sustained, " . . . which liability does not depend on negligence on the part of the defendant." Complaint, para. 14. Moreover, she asserts that her right of recovery under the second and third counts of the complaint are independent of the Convention. Defendant, on the other hand, argues that the Convention regulates liability between the parties, that this regulation preempts any and all common law rights of action, and that, absent an "accident", there is no liability.

Articles 17, 20, 21, and 25 provide the basic conditions for liability of the carrier under the Warsaw Convention:

[Article 17] "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the *accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking (Emphasis added)

.    .    .    .    .    .

[Article 20] "(1) The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures. . . .

[Article 21] "If the carrier proves that the damage was caused by or contributed to by the negligence of the injured person the court may, in accordance with the provisions of its own law, exonerate the carrier wholly or partly from his liability.

.    .    .    .    .    .

[Article 25] "(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.

"(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any

agent of the carrier acting within the scope of his employment."

Article 22 limits the liability of the carrier for each passenger to about $8,300. By the Montreal Agreement, this limit was raised to $75,000, and the defenses available under Article 20(1) were waived by the carriers.

■ As I understand it, the Convention does not "exclusively regulate" the relationship between passenger and carrier on an international flight, but rather sets limits on and renders uniform certain of the aspects of that relationship. Noel v. Linea Aeropostal Venezolana, 247 F.2d 677 (2d Cir.), cert. denied 355 U.S. 907, 78 S.Ct. 334, 2 L. Ed.2d 262 (1957); Zousmer v. Canadian Pacific Air Lines, Limited, 307 F.Supp. 892 (S.D.N.Y.1969); Komlos v. Compagnie Nationale Air France, 111 F. Supp. 393 (S.D.N.Y.1952), rev'd on other grounds, 209 F.2d 436 (2d Cir. 1953); Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, *supra* n. 1, 80 Harv.L.Rev. at 519. Indeed, it has been held that the Convention creates no new right of action, but rather creates " . . . a presumption of liability, leaving it for local law to grant the right of action." Noel v. Linea Aeropostal Venezolana, *supra*, 247 F.2d at 679. Since it is a treaty, it is the supreme law of the land, preempting local law in the areas where it applies. U.S.Const. Art. VI; United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); Smith v. Canadian Pacific Airways, Ltd., 452 F.2d 798 (2d Cir. 1971). Thus, it would seem to follow that if the Convention "applies", it applies to limit—not eliminate—liability; if it does not apply, it leaves

liability to be established according to traditional common law rules.

■ To invoke the Convention, there must be an "accident" within the contemplation of Article 17, and the burden of proof is upon the plaintiff to establish that such an accident occurred. MacDonald v. Air Canada, 439 F.2d 1402 (1st Cir. 1971). Defendant argues strenuously that if the "cause" of the damage is intentional, it is not an "accident", and that the proposed amendment to the Warsaw Convention known as the Guatemala City Protocol [2] bears out this construction by substituting the word "event" for "accident" in Article 17.

Although hijacking was probably not within the specific contemplation of the parties at the time the Warsaw Convention was promulgated, the Montreal Agreement seems to resolve whatever doubt might have existed over the construction of the word "accident". It is significant that press releases of the State Department and the order of the Civil Aeronautics Board do not mention the word "accident" in the context of recovering for personal injury, but rather accept the proposition that the Montreal Agreement imposes a system of "absolute liability" upon the carrier.[3] C.A.B. Order No. E–23680, 31 Fed.Reg. 7302 (1966); Department of State Press Release Nos. 110, 111, 54 Dep't. State Bull. 955, 956 (1966) ("Airlines in international travel will be absolutely liable up to $75,000 per passenger regardless of any fault or negligence. Recovery by those who need it most will thus be maximized and expedited. Long and costly lawsuits will be unnecessary in many cases.")

---

2. Official title: "Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955." Official text in ICAO Doc. 8932 (1971). *Signed at* Guatemala City, Guatemala, March 8, 1971 (not yet ratified).

3. "Since the Montreal liability system is based on a combination of treaty, contract, and administrative approval, and since it was hammered out by the State Department with the active support of the Civil Aeronautics Board and Federal Aviation Agency, its 'legislative history' may include the public expressions of the State Department and the Civil Aeronautics Board." L. Kreindler, 1 Aviation Accident Law, *supra*, § 12A.02 at 3.

More importantly, the Tariff filed pursuant to the Agreement by the airlines, effective May 16, 1966, contains the following proviso: "Nothing herein shall be deemed to affect the rights and liabilities of the carrier with regard to any claim brought by, on behalf of, or in respect of any person who has wilfully caused damage which resulted in death, wounding, or other bodily injury of a passenger." [4] The reason for this is concisely given by the Department of State: "Those guilty of sabotage and persons claiming on their behalf will not be entitled to recover any damages." 54 Dep't. State Bull., *supra* at 956. Thus, one is led to infer that the innocent victims of wilful acts by others are to be able to recover from the carrier, even in respect to acts of sabotage to the aircraft.

The analogy between hijacking and sabotage is clear, and defendant has failed to indicate any logical basis for distinguishing the two. The proceedings at Montreal and thereafter indicate plainly that sabotage was expressly discussed, and that it was the final intent of the parties to render the carriers liable to the innocent victims of such intentional acts. Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, *supra*, 80 Harv.L. Rev. at 593–596.

The policy underpinnings of the Warsaw Convention also lead to this conclusion. The Warsaw Convention as modified functions to redistribute the costs involved in air transportation: the carrier is best qualified initially to develop defensive mechanisms to avoid such incidents, since it physically controls the aircraft and access to it; it is likewise the party most capable of assessing and insuring against the risks associated with air transportation; finally, it is the party most able to distribute efficiently the costs of the first two steps. Although the current problem of hijacking may have been initially unanticipated, it is not unreasonable to assume that the law would leap to fill this logical gap.[5]

As discussed in note 1, *supra*, the documents comprising the interim "Montreal Agreement" do not constitute a treaty within the meaning of Article VI of the Constitution of the United States, and are not, strictly speaking, to be regarded as binding upon this court with the effect of a treaty. Yet it is difficult to question the modification effectuated by the Montreal Agreement of the contractual relationship between the parties within the Warsaw Convention system of liability. Moreover, a prime canon of treaty construction is to look to the subsequent action of the parties for the interpretation of the treaty in areas clearly unanticipated at the time.[6]

Hence, it is ruled that a hijacking is within the ambit of the term "accident", and sufficient to raise the presumption of liability under the Warsaw Convention as modified. This is all that is strictly necessary to dispose of defendant's motion for summary judgment at this time; however, I feel constrained to note one or two other matters in passing.

Article 17 provides that "[t]he carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or *any other bodily injury* suffered by a passenger . . ." (emphasis added). Defendant seems to accept the proposition that mental anguish and suffering are within the meaning of "other bodily injury", including in his reply brief a New York Supreme Court case holding to that effect. Herman v. Trans World Airlines,

---

4. The full texts of the Agreement and the Tariff can be found in L. Kreindler, 1 Aviation Accident Law, *supra*, § 12A.03–04.

5. Contrary to the urgings of defendant, I am unable to accord controlling significance to the substitution of the word "event" for "accident" in Article 17 by the Guatemala Protocol.

6. See Art. 31(3)(6), Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, 8 Int.Legal Materials 679 (1969), 63 A.J.I.L. 875 (1969).

Inc., 69 Misc.2d 642, 330 N.Y.S.2d 829 (Sup.Ct.N.Y.Co.1972). Although there is some question of fact, unresolved by the present record, whether plaintiff suffered actual bodily injury in addition to mental anguish (she alleges both in her complaint), I must confess to having some difficulty reading the Warsaw Convention to permit recovery for mental anguish and suffering alone. I note that "[t]he binding meaning of the terms [of the Convention] is the French legal meaning", Block v. Compagnie Nationale Air France, *supra*, 386 F.2d at 330. The French text of Article 17 reads in part: "Le transporteur est responsable du dommage survenu en cas de mort, de blessure, ou de toute autre lésion corporelle . . ." Although the word "blessure" comprehends not only a physical wound, but also any other "hurt" or "injury", J. Jéraute, Vocabulaire Francais-Anglais et Anglais-Francais de Termes et Locutions Juridique (1953), the context of the passage is controlled, in my opinion, by what follows—namely, "toute autre lésion *corporelle*". Interestingly enough, the Guatemala Protocol substitutes the phrase "personal injury" for the cited "wounding or other bodily injury"; however, the Montreal Agreement effects no change in the original language, and the C.A.B. order and press releases of the State Department recognize this implicitly. ICAO Doc. 8932, *supra*; C.A.B. Order No. E-23680, *supra*; Department of State Press Release Nos. 110, 111, *supra*.

 If, as I have indicated, mental anguish and suffering are not comprehended within the Warsaw Convention and Montreal Agreements, liability of the carrier for such injury may be precluded. This raises another problem: the Notice to Passengers included on the reverse of the ticket merely provides that "the Warsaw Convention may be applicable and the Convention governs and in most cases limits the liability of carriers for death or *personal injury* . . ." (emphasis added). If the ticket fails to give adequate notice of the applicability of the Convention, the carrier may not take advantage of the limitations on liability it provides. Lisi v. Alitalia-Linee Aeree Italiane, 370 F.2d 508 (2d Cir. 1966), aff'd by an equally divided court 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27, rehearing denied 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 671 (1968). Whether this is sufficient notice is at least arguable in this case, especially since the Convention acts to cut down common-law rights of action.

These latter issues need not be resolved at this point. As I have indicated, there are questions of fact which remain outstanding in addition to the ultimate question of the amount of damages actually sustained; and recovery under the Warsaw Convention is predicated upon proof not only of an accident, but of damages as well.

Defendant's motion for dismissal of the complaint and for summary judgment is therefore denied.

So ordered.